UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA    )<br>                                                               )<br>     v.                                                      )      Cr. No. 18-10468-NMGs<br>                                                               )<br>(16)  LUIS MEIJA GUERRERO,               )<br>                                                               )<br>                    Defendant                       ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

On December 6, 2021, Luis Mejia GUERRERO (hereinafter, "GUERRERO" or the "defendant") pleaded guilty to Count Thirteen of a superseding indictment charging him with conspiracy to distribute and to possess with intent to distribute 500 grams or more of cocaine. In so doing, the defendant admitted that at least 500 grams of cocaine were reasonably foreseeable and attributable to him.

In the final version of the Pre-Sentence Report ("PSR"), dated April 4, 2022, the United States Probation Office (hereinafter, "Probation") concluded that GUERRERO's total offense level ("TOL") was 21, his criminal history category ("CHC") was I, and his guideline sentencing range ("GSR") was 37-46 months. PSR, ¶¶ 34-46, 51, and 84.[1] For the reasons set out below, the government requests that the Court impose a sentence of 37 months, a sentence at the low end of his correctly calculated guideline range, followed by three years of supervised release.

### The Offense

As is described in detail in the PSR (¶¶ 9-29), for several years law enforcement has been

---

[1] The defendant objected to the two-level enhancement imposed by Probation pursuant to USSG § 2D1.1(b)(12) for maintaining a premises for the purpose of manufacturing or distributing a controlled substance. The government adopts Probation's response to GUERRERO's objection (PSR, at p. 28), and further notes that the Court imposed this enhancement when calculating the GSR for co-defendant Luis Alfredo Baez, the individual with whom the defendant shared the stash house.

investigating significant gang, gun-related violence, and drug trafficking activities in the city of Brockton, including the activities of Djuna Goncalves (hereinafter, "Goncalves"). In September 2018, agents from the Department of Homeland Security, Homeland Security Investigations (HSI), the Drug Enforcement Administration (DEA), and the Massachusetts State Police (MSP) began an investigation into a drug trafficking organization headed by Goncalves. Beginning in October 2018, agents received authorization to intercept a telephone used by Goncalves. Interceptions from Goncalves' phone led agents to identify one of Goncalves' drug suppliers, Jose Perez Felix, a/k/a "Grande" (hereinafter, "Perez Felix"), a Boston-based drug trafficker. Interceptions from Perez Felix's phone led agents to identify Luis Alfredo Baez (hereinafter, "Baez"), as one of Perez Felix's cocaine suppliers.

Agents subsequently identified GUERRERO as one of Baez's criminal associates. Baez and GUERRERO were a drug traffickers operating in the Bowdoin Street – Geneva Avenue section of Boston. GUERRERO and Baez worked together to distribute cocaine to multiple customers on a regular basis. Agents received authorization to intercept telephones used by both GUERRERO and Baez. Those interceptions revealed that both men worked together to distribute cocaine, often using coded language, and that they utilized a stash house located at 23 Mount Ida Road in Dorchester, Massachusetts. PSR, ¶ 16, 20, 22, 27. On a near daily basis, using a pole camera, agents watched GUERRERO, Baez, and others enter and exit the stash house after speaking in code about picking up or delivering cocaine.

For example, as set forth in detail in the PSR, in October 2018, agents intercepted calls between Perez Felix and GUERRERO discussing Baez supplying Perez Felix with cocaine. PSR, ¶ 15. The calls indicate that GUERRERO negotiated for Perez Felix to buy two ounces

(approximately 56 grams) of cocaine from Baez.  Subsequent calls indicate that GUERRERO met with Perez Felix to complete the transaction.  *Id.*

GUERRERO and Baez frequently spoke in coded language to discuss supplying customers with cocaine.  For example, as set forth in paragraphs 17-18 of the PSR, on March 31, 2019, agents intercepted a series of calls between Baez and GUERRERO during which they discussed supplying a customer with cocaine.  During one call, GUERRERO told Baez, "It's going to rain tomorrow around 11 or 12.  What time do you want it to rain?"  PSR, ¶ 17.  GUERRERO went on to tell Baez that he would bring him "38 cheles."  During subsequent calls the men agreed on a price of $1,520 for the cocaine ("One thousand five hundred twenty").  PSR, ¶ 18.

As set forth in detail in paragraphs 19-22 of the PSR, the interceptions and surveillance indicate GUERRERO delivered drugs to his own customers and to Baez's customers.  PSR, ¶¶ 19-22.  The calls and surveillance indicate that GUERRERO and Baez routinely utilized the stash house to store their drug supply.

In early May 2019, intercepted calls from GUERRERO and Baez's phones indicated that their drug cell was dry and that they were looking for additional drug supply.  On May 13, 2019, agents intercepted a call between Baez and co-defendant Cesar Rodriguez-Sanquentin (hereinafter, "Rodriguez-Sanquentin"), who they identified as a runner for a drug trafficking organization operating in the Methuen-Lawrence area of Massachusetts.  During that call, Rodriguez-Sanquentin offered Baez 500 grams of cocaine ("There is half of something around… I will see you with the three.  They're giving it to me with the two, so I can give it with the three… I called you first to see if you wanted half before I called someone else.").

Agents conducting surveillance observed Rodriguez-Sanquentin exit his residence carrying a bag, which he placed in the engine compartment of his vehicle.  At the request of

3

agents, a Massachusetts State Trooper conducted a stop of the vehicle once it was in Dorchester headed to Baez. As his vehicle was being pulled over, agents intercepted a call from Rodriguez-Sanquentin to Baez, during which he told Baez, "They have me stopped here at the beach." BAEZ responded, "Really?" and "They are always there." During the stop, agents recovered one kilogram of cocaine from the engine compartment of Rodriguez-Sanquentin's vehicle, as well as his cell phone. Agents dialed the number Baez had been in contact with to purchase cocaine that day, Rodriguez-Sanquentin's cell phone rang.

Agents conducting surveillance observed Baez at the stash house at 23 Mount Ida, then observed him drive to the area where Rodriguez-Sanquentin was stopped by the police. At the same time, agents intercepted Baez making several calls talking about how his supplier had been stopped and that he needed to clean out the stash house, including one such call to GUERRERO. The following is an excerpt of a translation of the call between Baez and GUERRERO following Rodriguez-Sanquentin's arrest:

| | | |
|---|---|---|
| GUERRERO: | | Tell me, man, I'm at the pharmacy. What are you up to? |
| BAEZ: | | I took everything out in a hurry, I'm on my way. Which pharmacy are you at? |
| GUERRERO: | | Here at the Center. |
| BAEZ: | | Andy's cousin was coming this way, man, he called me and he told me – He was coming with his wife driving and his son. The State Police had him stopped at the beach. I went by there, man. And they already had him lying down on the ground. And I had given the address from there, man. I went back and took everything right now. |
| GUERRERO: | | From over there, from the…? The drawer? [voices overlap] |

Agents conducting surveillance observed Baez leaving the stash house carrying a large black trash bag, get into a vehicle and drive away. At the request of agents, a marked Boston

4

Police cruiser stopped Baez and placed him into custody. Inside the black plastic bag was a digital scale, a cellular telephone, clear plastic bags commonly used to package drugs for street level sale, and a large wooden box with a padlock. After obtaining a warrant, agents opened the wooden box and seized $15,450 in U.S. currency, three green plastic twists of a white powdery substance, and another plastic residue. Laboratory results for the white powdery substance from the wooden box confirm the substances to be a total of 35.82 grams of cocaine.

Following the arrests of GUERRERO and Baez, agents obtained and executed a series of search warrants. From Baez's residence, agents seized $45,200 in U.S. currency. From GUERRERO's residence, all located in drawers of a bedroom nightstand, agents seized approximately $7,800 in cash, as well as a digital scale. PSR, ¶ 29.

## Recommended Sentence

Given the nature of the offense, and the history and characteristics of the defendant, the government submits that a sentence of 37 months incarceration is warranted. Based on the evidence gathered in this investigation, it is clear that GUERRERO was a member of a drug trafficking organization that routinely supplied others with cocaine, at least some of whom in turn sold to their own customers. Surveillance over the course of the investigation, combined with the interceptions, particularly those described above, establish that both Baez and GUERRERO utilized 23 Mount Ida as a stash house for their drugs and drug proceeds.

On June 23, 2021, the Court sentenced Baez to 41 months in prison, which was the sentence recommended by the government. Baez had the same guideline sentencing range as GUERRERO, however, with respect to Baez the government recommended a sentence at the middle of the range, based in part on the fact that Baez's criminal history was understated. Baez had been in default on a 2006 case for trafficking cocaine—essentially the same offense at issue here—for 12 years.

If Baez had been convicted of that crime, his criminal history score would likely result in a criminal history category of II, which would have resulted in a GSR of 41-51 months.

In light of the nature and scope of GUERRERO's conduct, his history and characteristics, and to avoid unwarranted sentencing disparities, a sentence of 37 months – the low end of the GSR – is an appropriate sentence. That sentence will serve general deterrence, specifically deter GUERRERO, promote respect for the law, and protect the public. *See* 18 U.S.C. § 3553(a). A sentence of 37 months, followed by three years of supervised release, is a sentence that is sufficient, but not greater than necessary to achieve the goals of sentencing. *Id.*

Wherefore, the government respectfully requests that the Court adopt the recommendation of the government and sentence GUERRERO to 37 months in prison and three years of supervised release. While the government anticipates that GUERRERO may be deported at the completion of his sentence, it is appropriate for the Court to impose a period of supervised release in the event that GUERRERO attempts to illegally return to the United States.

                                    Respectfully submitted,

                                    RACHAEL S. ROLLINS
                                  United States Attorney

By:    */s/ Alathea E. Porter*
        Alathea E. Porter
        Christopher Pohl
        Assistant U.S. Attorneys

### CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on April 5, 2022.

                                    */s/ Alathea E. Porter*
                                    Alathea E. Porter
                                    Assistant U.S. Attorney